# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
### BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>KENNETH WILLIAM PURKEY,<br><br>Defendant. | CR 24-15-BLG-SPW<br><br><br>ORDER |

Before the Court is Defendant Kenneth William Purkey's Motion to Suppress and Request for Evidentiary Hearing. (Doc. 20). Purkey is charged with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). (Doc. 3). Purkey seeks to suppress the physical evidence obtained from his arrest and search on August 7, 2023, and all evidence found in the resulting searches. (Doc. 21 at 2). The Government responded (Doc. 37), and Purkey replied (Doc. 39). An evidentiary hearing was held on May 17, 2024, during which Billings Police Department Detective Steve Hallam testified. (Doc. 41). The Court finds the material facts are not disputed based on the parties' briefing, the officers' reports, and Detective Hallam's testimony.

For the reasons stated below, the Court denies Purkey's motion.

1

## I.    Background[1]

In the course of investigating a suspect, Detective Steve Hallam listened to the recording of the suspect's jailhouse call with his girlfriend. (Doc. 37-1 at 5). The suspect spoke about a man named "Kenny," who he described as a felon who "rides around with [] guns all the time" and has a "garage full" of guns. (Doc. 38-1 at 5:00–12).   Additionally, the suspect said "Kenny" had "needles all over [the] garage," bathroom, and car, needle caps "everywhere," and "always had blood on his arms." (*Id.* at 6:40–44, 7:10–18, 8:04–06).   Detective Hallam believed this indicated that "Kenny" was a "user." (*See* Doc. 37-1 at 5). The suspect further said that "Kenny" and a woman named Nora had offered to babysit his baby. (*See id.* at 6:05–25, 6:55–7:10).

Detective Hallam testified that he determined "Kenny" was Kenneth Purkey based on a search of the jail's phone records.[2] He then ran Purkey's name through

---

1.  The facts are based on Detective Steve Hallam's report (Doc. 37-1); ATF Officer Dustin Stroble's report (Doc. 37-2); Billings Police Department Officer Smith's, Sergeant Peterson's, and Officer Bishop's reports (Doc. 37-3); audio from a Yellowstone County Detention Facility call, video from Detective Hallam's body camera, and video from Officer Best's body camera (Doc. 38).  The Court will refer to the jail audio and the video from Detective Hallam and Officer Best as Doc. 38-1, Doc. 38-2, and Doc. 38-3, respectively.  The Court notes that the time stamp in the video from Detective Hallam's body camera is approximately 13 minutes and 10 seconds ahead of Officer Best's body camera.
2.  While the Court finds it unclear how the jail phone records provided Detective Hallam with the information to determine that "Kenny" was Kenneth Purkey, since the recorded call was between the suspect and a girlfriend, the fact was not challenged.  The Court accepts as true that Detective Hallam was able to ascertain Purkey's name through a search of jailhouse phone records.

a law enforcement database, Law Enforcement Records Management Systems (LERMS), and saw that Purkey had had previous "interactions" with officers.

One of those "interactions" occurred on July 20, 2023. (Doc. 37-1 at 5). In the ensuing report, the officers reported responding to a call about a potential domestic dispute at Purkey's residence between Purkey and his wife, Nora Morgan. (Doc. 37-3 at 5). Officer Smith reported seeing a shotgun shell lying in the driveway. (*Id.* at 3). Sergeant Peterson reported seeing a bucket with "used syringes" in it, which he believed to be a "strong indicator of illegal drug use," and that Purkey appeared "under the influence." (*Id.* at 5). He also reported that he observed a handgun on the passenger floorboard of the car in the driveway and ammunition in a case in the front seat. (*Id.*).

Detective Hallam then requested a criminal history review from the Bureau of Alcohol, Tobacco, and Firearms ("ATF"). (Doc. 37-1 at 5). The ATF agent informed Detective Hallam that Purkey had a felony conviction, so Detective Hallam concluded that Purkey was prohibited from owning firearms. (*Id.*).

Detective Hallam began to surveil Purkey. (*Id.*). Detective Hallam testified that he knew the location of Purkey's residence based on information in a law enforcement database. While conducting surveillance on August 7, 2023, Detective Hallam saw Purkey and a female passenger drive away from Purkey's residence. (*Id.*). Detective Hallam followed the car and initiated a traffic stop for expired

3

license plates. (*Id.*). Detective Hallam asked Purkey for his driver's license, proof of insurance, and registration. (Doc. 38-2 at 1:43). Purkey informed Detective Hallam that he was driving his wife's car and that there were no weapons in the car. (*Id.* at 1:48–50, 2:44–47). Purkey searched for documentation for about four minutes. Purkey found the proof of insurance, which was expired, and showed it to Detective Hallam. (*Id.* at 5:13–55).

While standing by the driver's side window of the car, and while Purkey was searching for his documentation, Detective Hallam could see the "top of a plastic baggie sticking out of Purkey's left front pocket." (Doc. 37-1 at 5). "[B]ased on his experience and training," Detective Hallam knew such a plastic bag to "hold[] syringes." (*Id.*). Detective Hallam returned to his police cruiser, contacted dispatch to confirm the identities of Purkey and his female passenger and that Purkey's license plates were expired, and requested another officer "head his way." (Doc. 38-2 at 6:15–7:32).

Officer Best responded to Detective Hallam's location and came to the passenger window of Detective Hallam's car. (*Id.* at 13:05). Detective Hallam told Officer Best the following about Purkey:

> I've gotten information that he is involved in meth. Officers have been responding to his house a couple times for PFMAs and they noted that there are some firearm stuff there and some syringes. Listened to a jail phone call, and a guy that used to be friends with him says he's got lots of guns and is heavily involved in drugs, and he is prohibited out of the State of Florida. He is with a Britney Harper who, she says, is just on

their way to the Rimrock House, so she's getting clean. Looking at his left front pocket as I'm talking to him, he's got a plastic bag that looks like a syringe bag sticking out. So I'm not going to say anything about the firearms right now, but we are definitely going to search that car one way or the other.

(*Id.* at 13:15–14:06).

Detective Hallam returned to Purkey's car. (*Id.* at 14:18–29). In his testimony, Detective Hallam explained that, at this point in time, he believed Purkey to be engaged in illegal drug activity. He instructed Purkey to hang up his cellphone, to step out of the car, and to put his hands behind his back. (*Id.* at 14:30–48). Purkey complied, and Detective Hallam told Purkey to spread his feet. (*Id.* at 15:03). Detective Hallam patted Purkey's right front pant pocket and asked if he had a knife. (*Id.* at 15:03–10). He pulled Purkey's car key out of the right front pocket, then returned it to the pocket. (*Id.* at 15:10–14). Detective Hallam pulled a bag of insulin syringes out of Purkey's left pocket and asked, "Is that a needle baggie?" (*Id.* at 15:26–30). Purkey did not respond. Detective Hallam told Purkey that he was "just going to place [Purkey] in handcuffs because [he] ha[d] drug paraphernalia on [him]," and that Purkey was "detained," but "not under arrest." (*Id.* at 15:37–48). Detective Hallam handcuffed Purkey and asked Officer Best to "get [the passenger] out of the car." (*Id.* at 15:40–43; 16:12–13; Doc. 38-3 at 3:02–04).

In response to Detective Hallam's request, Officer Best instructed the passenger, Britany Harper, to "hop out" and told her to "have a seat" on the "push

bar" of his police cruiser. (Doc. 38-3 at 3:04–11). Officer Best asked Harper if she had any pockets or "anything on her," to which she replied that she did not. (Doc. 38-3 at 3:17–21). Officer Best walked down the sidewalk and past Purkey's car, where he told a woman on her bike, later identified as Morgan, to "step back . . . or [he] would charge her with obstructing." (*Id.* at 3:25–36). He turned and walked back down the sidewalk toward Harper, pausing for several seconds by Detective Hallam's police cruiser while Detective Hallam told Morgan that she should "get out of here or [she was] going to jail." (*Id.* at 3:57–4:21). Harper motioned to Officer Best, and he walked toward her. (*Id.* at 4:21–23). Harper said to Officer Best, "[Purkey] has a gun on the floorboard of the driver's seat." (*Id.* at 4:24–26).

In the approximately 90 seconds between when Officer Best instructed Harper to leave the car and Harper told him about the gun, Detective Hallam read Purkey his *Miranda* rights and asked Purkey about his drug use and what Purkey had in the car. (Doc. 38-2 at 16:26–17:07). Purkey told Detective Hallam that he had drug paraphernalia in the car. (*Id.* at 17:00–03). Detective Hallam asked Purkey if he had "dope on his person" because he had felt containers when patting Purkey down. (*Id.* at 17:40–48). By this time, Harper had informed Officer Best about the gun. (Doc. 38-3 at 4:24–26; Doc. 38-2 at 17:34).

Detective Hallam asked if he could "get everything out and make sure" (*id.* at 17:42–51), to which Purkey replied, "You're gonna do what you're gonna do" (Doc.

38-2 at 17:42–56). Detective Hallam pulled a small bag with six fentanyl pills out of Purkey's pocket. (*Id.* at 18:01–06; Doc. 37-1 at 5). In response to Detective Hallam's questions about Purkey's drug use, Purkey told Detective Hallam that he took fentanyl every day; he had additional drug paraphernalia in his car; and he had a gun in the car that he had moved when Detective Hallam pulled him over. (Doc. 38-2 at 18:49–21:04).

Purkey was transported to Yellowstone County Detention Facility for criminal possession of dangerous drugs in violation of Montana Code Annotated § 45-9-102(4). (Doc. 37-1 at 6). His car was towed to the impound lot of the Billings Police Department. (*Id.*). On August 8, 2023, Detective Hallam applied for and was granted a warrant to search the car Purkey was driving. (*Id.* at 12). Detective Hallam found the following items in the car: a Springfield XD 9mm pistol with a loaded magazine and a round in the chamber; 26.7 grams of methamphetamine; 21 suspected fentanyl pills; assorted drug paraphernalia; and assorted ammunition. (*Id.* at 12).

On January 18, 2024, Purkey was charged with one count of being a prohibited person in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). (Doc. 3). He filed the instant suppression motion on April 1, 2024. (Doc. 20).

## II.    Legal Standard

The Fourth Amendment protects the right to be free from unreasonable

searches and seizures.  The Supreme Court has repeatedly affirmed that "the ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Heien v. North Carolina*, 574 U.S. 54, 60 (2014) (quoting *Riley v. California*, 573 U.S. 373, 381 (2014)).  If law enforcement violates a defendant's Fourth Amendment right to be free from unreasonable searches and seizures, then, under the exclusionary rule, "all evidence seized as a result" of the unconstitutional actions of law enforcement "must be suppressed as the fruit of the poisonous tree." *United States v. Morales*, 252 F.3d 1070, 1073 (9th Cir. 2001) (citing *Wong Sun v. United States*, 371 U.S. 471, 484–85 (1963)).

## III.   Discussion

"Where a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing, . . . reasonableness generally requires the obtaining of a judicial warrant" supported by probable cause. *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 653 (1995).  A search without a warrant is per se unreasonable, "subject only to a few specifically established and well-delineated exceptions," *Arizona v. Gant*, 556 U.S. 332, 338 (2009), including for traffic stops, *Rodriguez v. United States*, 575 U.S. 348, 354 (2015), brief stops and frisks, *Terry v. Ohio*, 392 U.S. 1, 20 (1968), and searches incident to a lawful arrest, *United States v. Robinson*, 414 U.S. 218, 224 (1973).

Purkey generally argues that Detective Hallam unreasonably seized and searched him without a warrant. (Doc. 21). First, he characterizes Detective Hallam's connecting Purkey with the "Kenny" in the jailhouse call as acting on a hunch. (Doc. 21 at 7). Second, he argues that Detective Hallam pulled him over for having expired plates and was therefore limited to investigating the traffic infraction. (*Id.* at 9). He concedes that, had Detective Hallam "found evidence of guns or drug paraphernalia, he could have expanded his investigation," but Detective Hallam unreasonably expanded his search based on "a piece of plastic sticking out of [Purkey's] pocket." (*Id.*). Third, Purkey argues that, even if Detective Hallam had seen syringes, he unreasonably seized the syringes because driving with insulin syringes is not a crime, and Detective Hallam had no additional evidence that would indicate that the syringes were being used as drug paraphernalia, as required by Montana Code Annotated § 45-10-102. (*Id.* at 10). Fourth, he asserts that Detective Hallam arrested him "on a hunch unsupported by probable cause," so the ensuing search incident to arrest was invalid. (*Id.* at 11). Finally, he argues that the fruits of Detective Hallam's illegal seizure and search should be suppressed. (*Id.*).

In response, the Government generally argues that Detective Hallam acted lawfully because he had reasonable suspicion to investigate Purkey for drug paraphernalia, and that he lawfully prolonged the stop to investigate Purkey for a firearm offense. (Doc. 37). First, the Government asserts that Detective Hallam's

identification of Purkey as the "Kenny" in the jailhouse call was verified and not a hunch. (*Id.* at 3–4, 8). Second, the Government argues that reasonable suspicion existed to stop Purkey based on his expired license plates. (*Id.* at 6). Third, the Government argues that Detective Hallam had reasonable suspicion to stop Purkey for illegally possessing a firearm. (*Id.* at 6–9). Fourth, the Government asserts that Detective Hallam had reasonable suspicion to prolong the stop to arrest Purkey for possessing drug paraphernalia because Detective Hallam knew the bag in Purkey's pocket was for syringes. (*Id.* at 12). The Government argues that the bag of syringes combined with Detective Hallam's knowledge of Purkey's "bucket of needles," the jailhouse call, and the fact that there was a drug user in the car gave Detective Hallam reasonable suspicion that Purkey was in possession of drug paraphernalia. (*Id.* at 12–13). Fifth, the Government asserts that Detective Hallam lawfully ordered Purkey and the passenger out of the car as part of the traffic stop, and that, upon the passenger reporting that Purkey had a firearm in the car, Detective Hallam had reasonable suspicion to extend the stop and investigate the firearm offense. (*Id.* at 13–16). Finally, the Government argues that the totality of the circumstances gave Detective Hallam probable cause to arrest Purkey for possession of drug paraphernalia. (*Id.* at 14).

On reply, Purkey argues that the Government's response "appl[ied] the wrong test of reasonable suspicion when the challenged search in this case resulted from an

unreasonable seizure unsupported by probable cause." (Doc. 39 at 1). Purkey argues that he was seized when he was ordered out of the car, and that, as Detective Hallam did not have probable cause for that seizure, Detective Hallam unlawfully seized him. (*Id.* at 2). Purkey argues that Detective Hallam also did not have probable cause to arrest him for possession of drug paraphernalia because a reasonable person would not conclude that the plastic in Purkey's pocket was a bag of insulin syringes, and even if that inference was reasonable, a reasonable person would not conclude that possession of the insulin syringes was a crime. (*Id.* at 3–5). Finally, the statements made by Purkey's passenger regarding Purkey's possession of a firearm were not made until after the illegal seizure of Purkey, so her statements should be suppressed as fruit of the poisonous tree. (*Id.* at 5–6).

Because the parties dispute whether Detective Hallam acted on a "hunch" in connecting the "Kenny" mentioned in the jailhouse call audio to Purkey, the Court will first address Detective Hallam's verification of the information provided in the call. The Court will then analyze the validity of each search or seizure in turn. It will address the parties' arguments throughout.

### A. *Jail Call*

The Court first addresses whether Detective Hallam verified the information in the jailhouse call.

Purkey asserts that Detective Hallam "follow[ed] a hunch" and connected him to the Kenny of the jailhouse call. (Doc. 21 at 7). The Government argues that Detective Hallam acted reasonably because he confirmed the facts mentioned in the jail call. (Doc. 37 at 8).

The Court agrees with the Government. Detective Hallam confirmed many of the details provided by the caller by comparing them to the reports of the officers responding to the domestic dispute at Purkey's residence on July 20, 2023. In the jail call, the caller spoke of a Kenny connected to a Nora. The reports detail a Kenneth and a Nora involved in a domestic dispute. The caller said that Kenny had needles all over the garage, bathroom, and car, and blood all over his arms, and the reports described used syringes discarded in a bucket on the driveway, as well as Purkey being under the influence. The caller also reported that Kenny was a felon who "rides around with guns." The reports describe a discarded shotgun shell in the driveway and a gun and ammunition in the car. The ATF confirmed that Purkey was a felon.

Detective Hallam confirmed the information in the jail call, so he acted reasonably in relying on the information provided in the call.

B. *Detective Hallam Stops Purkey's Car for Expired Plates and Orders Purkey Out of the Car*

The Court next addresses the constitutionality of Detective Hallam ordering Purkey out of the vehicle during the traffic stop.

12

A traffic stop is "a relatively brief encounter," "more analogous to a so-called *Terry* stop than to a formal arrest." *Rodriguez*, 575 U.S. at 354 (quoting *Knowles v. Iowa*, 525 U.S. 113, 117 (1998) (internal punctuation marks omitted)).  To be lawful, a traffic stop must be limited in its scope: an officer may "address the traffic violation that warranted the stop," make "ordinary inquiries incident to the traffic stop," and "attend to related safety concerns."  *Id.* at 354–55 (quotations and alterations omitted).  The stop may last "no longer than is necessary to effectuate" these purposes and complete the traffic "mission" safely.  *Id.* at 354–55 (first quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983) (plurality opinion); and then quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)).  However, a stop "may be extended to conduct an investigation into matters other than the original traffic violation" so long as "the officers have reasonable suspicion of an independent offense." *United States v. Landeros*, 913 F.3d 862, 867 (9th Cir. 2019); *see also United States v. Rogers*, 656 F.3d 1023, 1027 (9th Cir. 2011) ("A period of detention may be permissibly extended where new grounds for suspicion of criminal activity continue to unfold.") (internal citations and punctuation omitted).

### i.    *Traffic Stop*

Purkey does not dispute that Detective Hallam had reasonable suspicion to stop him for driving with expired license plates. (Doc. 21 at 9).  The Government agrees.  (Doc. 37 at 6–7).  Accordingly, the Court accepts without deciding that

Detective Hallam lawfully stopped Purkey for a traffic infraction: driving with expired plates.

The parties disagree about whether Detective Hallam also had reasonable suspicion to stop the vehicle based on his underlying firearm investigation. (*See* Doc. 37 at 6–7; Doc. 21 at 9). Detective Hallam testified that he only stopped Purkey for the traffic infraction, so the Court finds the Government's position unsupported by the facts and will not consider whether Detective Hallam had reasonable suspicion to stop Purkey for a firearms offense.

### ii.    Ordering Purkey Out of His Car

Purkey argues that Detective Hallam unreasonably seized him when ordering him out of his car because Detective Hallam's investigation was limited to the traffic violation, and ordering Purkey out of the car impermissibly expanded the scope of the investigation. (Doc. 21 at 9). The Government responds that a police officer may order passengers to get out of a car "pending completion of the stop." (Doc. 37 at 14).

The Supreme Court has found the order to exit a vehicle during a traffic stop to be lawful. *United States v. Williams*, 419 F.3d 1029, 1030 (9th Cir. 2005) ("[I]t is well established that [during a traffic stop, the] officer . . . may order the driver and the passengers out of a vehicle[.]") (citing *Maryland v. Wilson*, 519 U.S. 408, 410 (1997)); *see also Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977) (finding

14

that when an officer orders a person to exit the car during a traffic stop, the additional intrusion on the driver's personal liberty is *de minimus*). Thus, when Detective Hallam ordered Purkey out of the car as part of the traffic stop, he did so lawfully.

Additionally, if Detective Hallam ordered Purkey out of the car as part of his investigation into Purkey's possession of drug paraphernalia, he did so lawfully because he had independently developed reasonable suspicion that Purkey had drug paraphernalia in violation of Montana law.

When Detective Hallam ordered Purkey out of the car, Detective Hallam knew the following: a jailhouse call described Kenny's bloody arms and needles scattered over Purkey's residence, the police had seen used syringes at Purkey's residence and reported that Purkey appeared to be under the influence, and Purkey possessed what Detective Hallam recognized, based on his training and experience, to be a bag of syringes. Together, these facts establish evidence of past drug use and evidence of possible possession of drug paraphernalia. This is sufficient to meet the threshold for reasonable suspicion. Thus, Detective Hallam could extend his investigation into Purkey's possession of drug paraphernalia. *See Landeros*, 913 F.3d at 867 (allowing officers to extend a traffic stop to investigate other matters "if the officers have reasonable suspicion of an independent offense")

Accordingly, the Court finds that Detective Hallam acted lawfully when he ordered Purkey to exit his car during the traffic stop.

C.     *Detective Hallam Takes the Syringe Packet out of Purkey's Pocket*

The Court will next address the constitutionality of Detective Hallam patting the pockets of Purkey's pants and removing the syringe bag from Purkey's pocket.

Purkey characterizes Detective Hallam's pat down of his pockets and removal of the syringe bag as a seizure without probable cause. (Doc. 21 at 9–10). The Government does not directly address Detective Hallam's authority but seems to assert that the pat down was a *Terry* frisk supported by reasonable suspicion that Purkey was engaged in criminal activity. (*See* Doc. 37 at 12–13). The Court must determine whether Detective Hallam searched Purkey incident to arrest, whether he frisked Purkey for weapons pursuant to *Terry*, or whether this was an unconstitutional search and seizure.

After he patted Purkey down, Detective Hallam explicitly told Purkey that he was not under arrest, so the Court finds that Detective Hallam was not executing a search incident to arrest. Rather, Detective Hallam was conducting a *Terry* frisk. Accordingly, the Court will analyze the lawfulness of the *Terry* frisk.

The Court first clarifies for the parties that a *Terry* stop and a *Terry* frisk are two separate events, each with its own conditions. *Johnson*, 555 U.S. at 326–27. As the Supreme Court explained in *Johnson*,

> First, the investigatory stop must be lawful. That requirement is met in an on-the-street encounter, *Terry* determined, when the police officer reasonably suspects that the person apprehended is committing or has committed a criminal offense. Second, to proceed from a stop to a frisk,

the police officer must reasonably suspect that the person stopped is armed and dangerous.

*Id.*; *see also United States v. Davis*, 530 F.3d 1069, 1082 (9th Cir. 2008) (holding that a frisk "violate[s] the Fourth Amendment unless [officers] had a reasonable belief or suspicion that he could be armed or posed a threat to their safety.").

Under *Terry*, when an officer has "reasonable suspicion that an individual is engaged in a crime," the officer may conduct a *Terry* stop, in which the officer "briefly detain[s] the individual and make[s] 'reasonable inquiries aimed at confirming or dispelling the officer's suspicions.'" *United States v. Baker*, 58 F.4th 1109, 1117 (9th Cir. 2023) (quoting *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993)). The Government has the burden of providing "specific, articulable facts which, together with objective and reasonable inferences, form a basis for suspecting that a particular person is engaged in criminal conduct" to justify reasonable suspicion. *United States v. Thomas*, 211 F.3d 1186, 1189 (9th Cir. 2000) (internal citation and quotation marks omitted).

An officer may proceed to a *Terry* frisk if the officer has reasonable suspicion that the person is armed and dangerous. *See Ramirez v. City of Buena Park*, 560 F.3d 1012, 1022 (9th Cir. 2009) ("Nothing in *Terry* can be understood to allow a generalized cursory search for weapons or indeed, any search whatever for anything but weapons.") (internal quotations omitted). The purpose of a *Terry* frisk is to

17

ensure the safety of the officer and others in proximity. *See Thomas v. Dillard*, 818 F.3d 864, 875–76 (9th Cir. 2016).

Accordingly, the Government's argument that Detective Hallam had authority to frisk based on his reasonable suspicion that Purkey was engaged in criminal activity incorrectly conflates the two steps of *Terry*. As explained above, Detective Hallam had reasonable suspicion that Purkey was engaged in a crime: the possession of drug paraphernalia. Thus, the *Terry* stop was valid. The Court must next determine whether Detective Hallam had reasonable suspicion that Purkey was armed and dangerous, and therefore could conduct a *Terry* frisk. In doing so, the Court looks to the information Detective Hallam gave Officer Best before returning to Purkey's car.

While a close question, the Court finds that the jailhouse call, the police report of the domestic disturbance at Purkey's residence approximately two weeks prior, and Detective Hallam's observations during the traffic stop gave him reasonable suspicion that Purkey was armed and dangerous. Detective Hallam first told Officer Best that police had been called to Purkey's house after reports of domestic violence. Detective Hallam next explained to Officer Best that he suspected that Purkey had "lots of guns." This conclusion was supported by the shotgun shell, ammunition, and gun seen by the officers responding to the domestic disturbance call at Purkey's home. Detective Hallam believed that the officer's observations reinforced the

information provided in the jailhouse call: that Kenny "rides around with [] guns all the time." Additionally, once Purkey was out of his car, his ability to attack Detective Hallam increased. *See United States v. Doan*, 219 F. App'x 663, 665 (9th Cir. 2007) (finding that a defendant outside of his car during a traffic stop increases his ability to attack the officer). While none of these facts on their own establish reasonable suspicion to justify a frisk, the totality of the circumstances gave Detective Hallam reasonable suspicion that Purkey was armed and dangerous, and therefore reasonable suspicion to frisk Purkey for weapons.

Purkey argues that Detective Hallam unconstitutionally seized the syringes when he removed them from Purkey's pocket. The Court finds that Purkey misunderstands the nature of the frisk. The Court cannot expect Detective Hallam to conduct a pat down for officer safety and not remove a bag of suspected sharp— and possibly used—syringes in Purkey's pocket that could injure Detective Hallam during the pat down. Accordingly, it was permissible for Detective Hallam to remove the syringes for his safety during the frisk.

### D. Detective Hallam Searches Purkey Incident to Arrest

The Court next addresses the constitutionality of Detective Hallam's arrest and subsequent search of Purkey.

An officer must have probable cause to arrest a suspect. "Probable cause exists when, under the totality of the circumstances known to the arresting officers

(or within the knowledge of the other officers at the scene), a prudent person would believe the suspect had committed a crime." *Dubner v. City & County of San Francisco*, 266 F.3d 959, 966 (9th Cir. 2001) (citation omitted).   The arresting officer's subjective intention "is immaterial in judging whether their actions were reasonable for Fourth Amendment purposes." *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007).   Though an officer need not have probable cause for every element of an offense, "when specific intent is a required element of the offense, the arresting officer must have probable cause for that element to reasonably believe that a crime has occurred." *Gasho v. United States*, 39 F.3d 1420, 1428 (9th Cir. 1994).

When an officer arrests a suspect, the officer may also search the suspect incident to the arrest to disarm the suspect and preserve evidence for trial. *United States v. Robinson*, 414 U.S. 218, 234 (1973).   The search is "not limited to [a] simple pat-down of the suspect and can 'involve a relatively extensive exploration' of the areas within the arrestee's immediate control." *United States v. Williams*, 846 F.3d 303, 312 (9th Cir. 2016) (quoting *Robinson*, 414 U.S. at 227).

The Court first establishes that Purkey was under arrest when Detective Hallam began reading the handcuffed Purkey his *Miranda* rights. *See Stansbury v. California*, 511 U.S. 318, 322 (1994) ("[T]he ultimate inquiry [of whether a person was in custody] is simply whether there was a formal arrest or restraint on freedom

of movement of the degree associated with a formal arrest.") (internal punctuation omitted). The next question is whether Detective Hallam had probable cause for the arrest.

Under the totality of the circumstances known to Detective Hallam, once he saw the bag of syringes, he had probable cause to arrest Purkey for violating Montana Code Annotated § 45-10-103.

Section 45-10-103 makes possessing drug paraphernalia "with intent to use drug paraphernalia to . . . inject, ingest, inhale, or otherwise introduce into the human body a dangerous drug" a misdemeanor offense. Drug paraphernalia is defined as

> all equipment, products, and materials of any kind that are used, intended for use, or designed for use in planting, propagating, cultivating, growing, harvesting, manufacturing, compounding, converting, producing, processing, preparing, testing, analyzing, packaging, repackaging, storing, containing, concealing, injecting, ingesting, inhaling, or otherwise introducing into the human body a dangerous drug.

Mont. Code Ann. § 45-10-101(1). In deciding what constitutes drug paraphernalia, the Montana Code provides a non-exclusive list of items. *Id.* While syringes and hypodermic needles are not on the non-exclusive list, the Montana Supreme Court has found that a syringe or hypodermic needle may be drug paraphernalia for purposes of § 45-10-103. *City of Great Falls v. Monroe*, No. DA 18-0338, 2019 WL 4633652, at *2–3 (Mont. Sep. 24, 2019). Courts also consider a number of factors in determining whether an item constitutes drug paraphernalia, including a suspect's

prior convictions related to controlled substances, proximity to dangerous drugs, the "existence and scope of legitimate uses for the object in the community", and "expert testimony concerning its use." Mont. Code Ann. § 45-10-102(2), (4), (6), (13), (14).

Viewed in isolation, Purkey's possession of insulin syringes is insufficient to provide probable cause for the arrest. However, in considering the syringes in the context of all that Detective Hallam knew, Detective Hallam had probable cause that the syringes in Purkey's possession qualified as drug paraphernalia. First, Purkey was in possession of syringes, which may be considered drug paraphernalia. Second, based on the reports from the domestic disturbance incident and the jailhouse call audio, Detective Hallam knew that Purkey previously showed signs of intravenous drug use. Third, as Detective Hallam alluded to in his testimony, in his training and experience, insulin syringes are used for injecting illegal drugs.

Even if Detective Hallam mistakenly thought that having a bag of syringes was a violation of the law, such mistake of law does not make the search or seizure unconstitutional. *See Heien v. North Carolina*, 574 U.S. 54–55 (2014). Law enforcement is entitled to reasonable mistakes of law when determining if probable cause exists. *Id.* at 55; *see also Michigan v. DeFillippo*, 431 U.S. 31, 37, 39 (1979) (holding that officers' reasonable assumption that a law was valid gave them "abundant probable cause" to make the arrest). Given the language of the drug paraphernalia statute, Detective Hallam's belief that Purkey was in violation of the

22

law was reasonable.  Thus, Detective Hallam acted constitutionally when he arrested Purkey and searched Purkey incident to the arrest.

      E.     *Officer Best Instructs the Passenger to Exit the Car*

Purkey finally argues that Harper's statements to Officer Best should be excluded as "fruit of the poisonous tree."  Because the Court finds that Detective Hallam did not illegally search Purkey or illegally seize the syringes during the frisk and the drugs in Purkey's pocket during the search incident to arrest, Harper's statements to Officer Best are not suppressed as fruit of the poisonous tree.

## III.   Conclusion

IT IS HEREBY ORDERED that Defendant Kenneth Purkey's Motion to Suppress (Doc. 20) is DENIED.

DATED this *11th* day of June, 2024.

SUSAN P. WATTERS
United States District Judge